# DECLARATION OF SANTOS REYES

I, Santos Reyes, being duly sworn, do hereby depose and state as follows:

## DECLARANT'S BACKGROUND AND TRAINING

1. I am a Special Agent with the Drug Enforcement Administration (DEA) and have been since June 2022. I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510 (7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. My current assignment is at the Portland District Office where I am assigned to a DEA federal task force. My formal education includes a Master of Science in Criminology with a focus in Human Behavior. My formal law enforcement training includes successfully completing 26-week Basic Recruit Training at the Denver Police Academy in Denver, Colorado, followed by field training in Denver, Colorado. Also, I have successfully completed Basic Agent Training course at the DEA academy in Quantico, Virginia. I have participated in multiple drug investigations involving controlled purchase operations, surveillance, arrests, interdiction, vehicle tracking, cell phone geo-location techniques, trap and trace orders, and Title III wiretaps. I have interviewed and operated informants, executed search warrants, arrested and interviewed subjects involved in the smuggling and distribution of narcotics, conducted physical surveillance, and utilized electronic and video surveillance. I have also worked with and consulted numerous agents and law enforcement officers who have investigated drug trafficking offenses.

2. Part of my work includes following up on law enforcement leads relating to the transportation and sale of illegal controlled substances in the Portland metro area, including at the Portland International Airport. I work with a task force comprised of federal and local law enforcement officers.

## PURPOSE OF THIS DECLARATION

3. This declaration is submitted in support of a complaint for forfeiture. The information contained in this declaration is based on an investigation conducted by the Drug Enforcement Administration, and other law enforcement agencies, which will show that $9,905 in U.S. Currency (**Subject Currency 1**), seized from Glendale Terry III ("TERRY"), and $11,000 in U.S. Currency (**Subject Currency 2**), seized from Corey Bradley Sanders ("SANDERS"), are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6), as moneys and assets furnished or intended to be furnished by any person in exchange for a controlled substance, proceeds traceable to such an exchange, or moneys used or intended to be used to facilitate violations of 21 U.S.C. § 801, *et. seq*.

4. The information contained in this declaration is based upon my personal observations, training, and experience, and that of other law enforcement officers. This declaration does not contain each and every fact that I know about this investigation, only those necessary to establish probable cause the seized currency is subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

## INVESTIGATIVE SUMMARY

*February 16, 2023: Interaction with Glendale TERRY and Corey SANDERS, and Seizure of U.S. Currency at Portland International Airport*

5. The DEA received information that Glendale TERRY was flying from South Carolina to Portland, Oregon on February 16, 2023, via Delta flight #373, that he had a one-way ticket, and he did not check any bags. A criminal history check revealed that TERRY had several arrests related to marijuana and most recently an arrest for bulk marijuana (10 to 100 pounds) in late 2022. Officers also reviewed a police report from June 2022 describing that TERRY had rented a room in Portland, Oregon, and multiple subjects were suspected of carrying marijuana to or from TERRY's room. One subject abandoned a tote after seeing security; it had six bags of marijuana in it. Based on this information, investigators believed that TERRY was likely on his

way to Portland to purchase marijuana. Officers received a copy of TERRY's South Carolina driver's license with his photograph on it.

6. At approximately 11:30 a.m., task force officers established surveillance of terminal D7, where Delta Flight 373 was designated to unload passengers. At approximately 12:04 p.m., Investigators observed TERRY exit the jet bridge carrying a plastic bag, wearing a backpack, and a satchel slung across his torso. TERRY continued to walk on foot towards the exit of the airport terminal.

7. Within the security area of the airport, the task force had a trained narcotics canine conduct an odor recognition test on several arriving passengers and their carry-on bags, with the consent of the passengers. This included TERRY. The trained narcotics canine sniffed but did not alert on several arriving passengers preceding TERRY. As TERRY passed the canine, the dog alerted to an odor emanating from TERRY's satchel. TERRY told a task force officer he had some cash in his satchel. Law enforcement searched the satchel and found cash inside it, later counted as $9,905. (**Subject Currency 1**).

*Investigators Interview TERRY*

8. Investigators asked TERRY why he was travelling to Portland. TERRY said that it was to shop at the stores in Portland, Oregon, since there was no sales tax. TERRY said he planned to stay in Portland for three days, but he had not made any hotel reservations.

9. Investigators asked where TERRY had obtained **Subject Currency 1**. TERRY stated he had a dog breeding business in South Carolina. Investigators asked TERRY about the business registration. TERRY said the business was not registered in the state of South Carolina. TERRY stated he had additional business he was involved in but provide no details. TERRY had no documentation or bank transaction information relating to **Subject Currency 1**.

10. TERRY told task force officers that he was travelling alone. Investigators noticed that TERRY had two cell phones with him and that he was engaged in texting during the law enforcement encounter. Investigators observed an unknown male, later identified as SANDERS, continuously looking back at the interaction between TERRY and Investigators. Investigators maintained constant surveillance of SANDERS as he was attempting to exit the terminal.

### *SANDERS Interaction and Seizure of Subject Currency 2*

11. Investigators encountered SANDERS just outside the airport near the pedestrian unloading area. SANDERS told Investigators that he had traveled with TERRY from South Carolina to Portland, Oregon. Investigators asked SANDERS if he would consent to an odor recognition test conducted by the trained narcotics canine. SANDERS consented to the test. The canine alerted to an odor emanating from SANDERS' backpack. SANDERS provided additional consent for Investigators to search his backpack. Investigators found cash (**Subject Currency 2**) located in the large compartment of SANDERS' backpack. The cash was later counted and determined to be $11,000.

12. SANDERS stated he was on the same flight as TERRY, and that TERRY had made the arrangements, including lodging. SANDERS stated the purpose of the trip was to buy French bulldogs, but he was unable to identify the name of the breeder or any intended transaction details.

13. SANDERS provided consent for Investigators to view messages on his cell phone. SANDERS unlocked his phone. Investigators observed communications between SANDERS and TERRY in which TERRY was coaching SANDERS on how to avoid contact with Investigators. One of the communications was between SANDERS and "Boosie," who SANDERS identified as TERRY. The time of the text communication was around 12:34 p.m.,

which is just after TERRY and SANDERS had departed the aircraft, as well as the time of the initial interaction between law enforcement and TERRY. The text string stated in part: "Keep walking." "Long as you out tge [sic] airport you good tell them they can't search u or yo stuff," "Tell them you don't know me."



14.     Investigators observed additional phone messages on SANDERS' phone that contained pictures of what I believe to be packaged marijuana, and prices for the product. Investigators observed other communication strings discussing the sale of marijuana, including amounts to be ordered, price, and available strains of marijuana.



Declaration of Santos Reyes                                             EXHIBIT A   PAGE 6



15.     Investigators confronted SANDERS with the messages about marijuana. SANDERS then admitted that he sold marijuana on the side to earn extra cash.

16.     I know based on my training, experience, and consultation with other narcotics Investigators, that drug traffickers often transport drug proceeds from the east coast to Oregon. I know that Oregon is a source state of marijuana for east coast and southern states, including South Carolina. Marijuana - a controlled substance under federal law - is illegal under South Carolina state law, and there is a profitable black market for the sale of marijuana obtained from states like Oregon.  Furthermore, it is common for money from the sales of marijuana in other states to be transported back to Oregon via commercial flights often purchased by drug dealers at the last minute with no return flight or a quick turn-around flight.

## CONCLUSION

17. I believe **Subject Currency 1** and **Subject Currency 2** were obtained through the illegal sale of marijuana, and were to be used to purchase marijuana, and are therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6), as moneys and assets furnished or intended to be furnished by any person in exchange for a controlled substance, proceeds traceable to such an exchange, or moneys used or intended to be used to facilitate violations of 21 U.S.C § 801, *et. seq*.

I declare under penalty of perjury that the foregoing is true and correct pursuant to 28 U.S.C. §1746.

Executed this 22nd day of December, 2023

*/s/ Santos Reyes*
SANTOS REYES
Special Agent
Drug Enforcement Administration